# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Case No. 19-CR-183-JED |
| CLINTON EUGENE ROSE, | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

Before the Court is the defendant's Motion to Suppress (Doc. 14), to which the government responded (Doc. 15). The Court conducted a hearing on the motion and heard the testimony of one witness, Tulsa Police Officer Edward Trice, and received in evidence the police reports (Exhibit 1) associated with the defendant's arrest.

**I.  Suppression Proceedings**

The purpose of suppression proceedings is to "determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." *See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). A motion to suppress is governed by Rule 12. *See* Fed. R. Crim. P. 12(b)(3)(C). Pursuant to Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." This opinion shall serve as the Court's essential findings on the defendant's suppression motion.

## II. Background

The defendant is charged by Indictment (Doc. 2) with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). His arrest stemmed from an investigatory stop by Tulsa Police officers on April 16, 2019. On that day, Tulsa Police Department (TPD) Officers Edward Trice and Brett Sanders were assisting Tulsa International Airport Corporal Dan Fritz in an investigation of trash dumping and an abandoned vehicle on airport property. Officer Trice is a TPD bomb dog handler assigned to the Tulsa International Airport. The area where the officers were located was one of several areas of airport property where illegal dumping of household items, tires, and stolen property had become a problem.

Just before noon on April 16, 2019, the officers saw a blue truck with two occupants turn off of Port Road onto a drive leading into a rural field on airport property, where the officers were conducting their investigation into dumping. The driveway was off of Port Road in a rural area and was partially paved with asphalt, turning into a horseshoe-shaped dirt road around a tree. The truck's bed was loaded with items covered by a blue tarp, which extended above the truck's bed, and Officer Trice believed that the tarp appeared as if it may be covering trash.

Officer Trice testified that he commented to the other two officers that the occupants of the truck may be who had been dumping at that location. (*See also* Exhibit 1 at 2 [Trice reported that he commented that the occupants "may be our illegal dumpers"]). Once the driver of the truck saw the police officers, the driver quickly turned the truck around and drove back to Port Road. Officer Trice got in his truck and followed. The driver was

2

driving fast enough that he gained some distance ahead of Officer Trice's truck and had already made it to the east of Highway 169. Trice testified that it appeared that the driver was attempting to get further ahead of the officers, who were a few car lengths behind him in a construction zone. Ultimately, Trice caught up to the vehicle and initiated a stop on the suspicion that the occupants of the truck had illegally dumped and/or were there to illegally dump on airport property.

Upon stopping the vehicle and approaching the driver in the truck, Officer Trice noticed boards, construction tools, construction trash, papers, and tubes of stuff. Officer Trice told the driver, Clinton Rose, that he was being stopped because the airport had a problem with illegal dumping and the way the truck's load was covered and the way Rose pulled in and then immediately turned around upon seeing officers appeared suspicious. Trice informed Rose that he wanted to make sure that Rose was not dumping trash on airport property. Rose informed Trice that he only had work tools, he was not illegally dumping, and he had just made a wrong turn. Rose's claim that he had made a wrong turn did not appear to Officer Trice to be true given the specific location and the fact that, before exiting Port Road onto the driveway, Rose could have more safely and easily made a legal U-turn from the left turn lane on Port Road rather than having to cross the road and traffic again from the driveway on the north, where the officers first saw him.

Officer Trice requested Mr. Rose's driver's license. Rose produced an Oklahoma driver's license, with an expiration date of February 28, 2018. (*See* Exhibit 1). Officer Trice noted that the license was expired, and Rose indicated that the license had been suspended. Officer Trice returned to his vehicle to run a records check on Mr. Rose and

3

the passenger of the truck. A records check revealed that Mr. Rose had a master file with the TPD, he was an ex-convict, his driver's license was suspended, and he had an outstanding warrant from Wagoner County.

When Officer Trice returned to the truck, he returned the license to Mr. Rose. As Trice was handing the passenger's identification back, he noticed the barrel of a gun under the center armrest. Trice looked directly at the passenger and asked the passenger whether the gun was his, because Trice knew that Mr. Rose was an ex-con. The passenger said it was not his gun. Mr. Rose then stated that it was Rose's gun. Trice told Rose that he is a convicted felon and was not supposed to have a firearm. Mr. Rose was then placed under arrest and was subsequently charged by Indictment in this case for being a convicted felon in possession of a firearm. Only approximately 10 minutes elapsed from the time Trice stopped Mr. Rose's vehicle to the time he placed Mr. Rose under arrest.

## III. Discussion

Mr. Rose moves to suppress "all evidence and statements related to the stop and search of Mr. Rose's vehicle, the gun located therein, and statements made." (Doc. 14). He argues that "[t]here was no probable cause or reasonable suspicion to stop, detain, question or search Mr. Rose's vehicle" and "[t]here was no indication of any wrongdoing by Mr. Rose, or that he had engaged, or attempted to engage, in the misdemeanor offense of illegal dumping. . . ." (*Id.* at 1).

### A. The Initial Stop

The Fourth Amendment guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST.

amend. IV. Those protections apply to investigatory stops. When a law enforcement officer performs an investigative detention of a person, it is referred to as a *Terry* stop. *See United States v. Hernandez*, 847 F.3d 1257, 1267-68 (10th Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Because a *Terry* stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest." *Id*. at 1268. "An officer may constitutionally 'stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" *United States v. Briggs*, 720 F.3d 1281, 1284-85 (10th Cir. 2013). Thus, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity" or has already committed a crime. *United States v. Cortez*, 449 U.S. 411, 417, n.2 (1981).

A *Terry* stop must be based on "'something more than an inchoate and unparticularized suspicion or hunch.'" *Briggs*, 720 F.3d at 1285 (quoting *United States v. Sokolow*, 490 U.S. 1, 15 (1989). However, "'the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause.'" *Id.* (quoting *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008)). "Even if it is more likely that an individual is not involved in criminal activity, an officer still may have reasonable suspicion to stop and detain the individual." *Id.* "The detaining officer needs only to articulate 'some minimal level of objective justification' for the detention." *Id.* (quoting *Sokolow*, 490 U.S. at 7).

5

The analysis is ultimately "guided by the 'touchstone' of reasonableness." *Id.* (quoting *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012)). The courts look to the totality of the circumstances known to the detaining officer and must defer to the ability of trained law enforcement officers to identify suspicious behavior. *Id.* (citation omitted). That analysis is objective and asks whether the facts available to the detaining officer at the time warranted a reasonably cautious officer believing that the detention was appropriate. *See id.*

Officers Trice and Sanders had reasonable suspicion to believe that criminal activity may be afoot. When they first saw Rose, he was driving a truck with a bed full of items covered with a tarp up to a rural field on an area of airport property where the officers were investigating illegal dumping. Officers then observed that Rose immediately turned his truck around upon seeing the officers there.

Rose was not on a regular through street; he had driven onto a driveway into a rural field on airport property, where illegal dumping had become a problem. Indeed, the officers were there at the time investigating an abandoned vehicle and trash dumped around that area of the property, and they suspected that Mr. Rose may have been the illegal dumper and that he had returned to illegally dump. As they were investigating the illegal dumping on airport property and upon seeing the truck pull into the field with a bed full of items covered by a tarp, Officer Trice commented to the other officers, "look, that may be our illegal dumpers." (Exhibit 1 at 2).

"[A]n area's disposition toward criminal activity [is] a factor that contributes to an officer's reasonable suspicion." *United States v. Guardado*, 699 F.3d 1220, 1223 (10th

Cir. 2012). While the character of an area, alone, does not establish reasonable suspicion, it is a factor to be considered when examining the totality of the circumstances. *Id.* "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009).

The fact that Mr. Rose immediately turned the truck around when he saw officers there is another factor that is appropriately considered. "Evasive behavior is a factor in [the] Fourth Amendment analysis because while not determinative of wrongdoing, it certainly can suggest it." *Guardado*, 699 F.3d at 1224; *see also Wardlow*, 528 U.S. at 123-24; *Briggs*, 720 F.3d at 1286. In *United States v. Madrid*, 713 F.3d 1251, 1257 (10th Cir. 2013), a defendant convicted of being a felon in possession of a firearm appealed his conviction based upon the district court's denial of his motion to suppress. The defendant's vehicle was stopped by police when the defendant was attempting to exit the parking lot where a potential fight had previously been reported to police. The Tenth Circuit determined that "the district court did not err in considering [the defendant's] attempted exit from the parking lot just after a police car drove by in its reasonable suspicion analysis." *Id.*

Based upon the foregoing, and considering the totality of the circumstances, the Court finds that the officers had reasonable suspicion supported by articulable facts that the defendant had dumped previously and/or was there to dump illegally, and thus that

7

criminal activity may be afoot.[1] The officers had more than a mere unparticularized suspicion or hunch because of the precise area where they were already investigating illegal dumping, the appearance of the blue truck with a bed covered by a tarp that appeared as if it may be covering trash, and the defendant's evasively turning the truck around immediately upon seeing the officers.

B. **The Duration of the Stop**

Even where the initial stop is lawfully premised upon reasonable suspicion, the scope of the investigative detention "must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Terry*, 392 U.S. at 20. The Supreme Court has held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, __ U.S. __, __, 135 S. Ct. 1609, 1612 (2015). An officer may make ordinary inquiries incident to the stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," which serve the same objective as enforcement of the traffic code. *Id.* at 1615; *see also United States v. Burleson*, 657 F.3d 1040, 1046-47 (10th Cir. 2011) (officer may run background and warrants checks during investigatory stops).

---

[1] Under Oklahoma law, dumping of trash on public or private property without permission is a misdemeanor punishable by fine and/or jail time. *See Okla. Stat.* tit. 21, § 1761.1(A), (E).

Mr. Rose does not identify any particular basis for asserting that the stop's duration was unreasonable or otherwise violated the Fourth Amendment. Approximately ten minutes passed from the time of the stop to the arrest. During that time, officers asked Mr. Rose for his driver's license, which was expired on its face. Upon running a background check, Officer Trice determined that Mr. Rose was a convicted felon, he had a warrant from Wagoner County, and his driver's license had been suspended. Mr. Rose's claim that he was only turning around did not seem true to Officer Trice, because Rose could have more safely made a legal U-turn from Port Road. Then, when Trice returned to the vehicle, he saw – in plain view – the barrel of a firearm sticking out from the console. With the information of Mr. Rose's status as a convicted felon and determining that the firearm belonged to Mr. Rose, he appropriately arrested Mr. Rose for being a felon in possession of a firearm. Based upon the foregoing, the Court finds and concludes that the duration of the investigative detention was reasonable and did not violate the Constitution.

### C. Seizure of the Firearm and Mr. Rose's Statement of Ownership

The firearm was seen by Officer Trice in plain view inside the truck, sticking out from the console. "If an officer is lawfully positioned in a place from which an object can be plainly viewed, the officer is permitted to notice whatever is put on display and the observation of the article is generally not considered a search." *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014). "'If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.'" *Id.* (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)). However, the seizure of an object may invade the owner's possessory interest such that "an object in plain view may be seized only where

9

the incriminating character of the object is 'immediately apparent' to the officer and the officer has a lawful right of access to the object itself." *Id.* (citation omitted). If the officer lacks probable cause to believe that the object in plain view is contraband, then its incriminating nature is not immediately apparent, and the plain view doctrine will not justify its seizure. *Id.* However, temporary seizures of guns may be permissible when reasonably connected to the safety of officers or others. *Id.* (citations omitted).

Here, Officer Trice saw the firearm in plain view *after* he ran the background check and learned that Mr. Rose was a convicted felon. Thus, he had probable cause to believe that the firearm was illegal contraband. *See* 18 U.S.C. § 922(g)(1). He inquired of the passenger whether he owned the gun. After the passenger denied ownership and possession of a permit for the gun, Mr. Rose volunteered that the firearm was Rose's. Officer Trice appropriately seized the firearm at that time. The temporary seizure would have been justified to secure officer safety at that time, but he also had probable cause to believe that Rose was unlawfully possessing it, which would justify its seizure and Mr. Rose's arrest.

Mr. Rose's motion is premised upon a violation of the Fourth Amendment and not the Fifth or Fourteenth Amendments. (*See* Doc. 14). With respect to suppression of his incriminating statement about ownership of the firearm, he argues that it should be suppressed as a consequence of the alleged lack of reasonable suspicion for the stop and purported prolonged detention. As the Court has determined that there was no Fourth Amendment violation, Mr. Rose's argument for suppressing his incriminating statement during the stop is likewise rejected.

Even had Mr. Rose argued that his incriminating statement was obtained in violation of the Fifth or Fourteenth Amendments, the Court would find no such violation under the evidence presented. Mr. Rose volunteered the information and was not being subjected to a custodial interrogation at the time. In *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), the Supreme Court held that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." By its own terms, *Miranda* only applies to "questioning initiated by law enforcement officers after a person has been taken into custody." *Id.* at 444; *see also United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("*Miranda* only applies when an individual is subject to 'custodial interrogation.'"); *United States v. Cash*, 733 F.3d 1264, 1276-77 (10th Cir. 2013) ("For *Miranda*'s protections to apply, 'custodial interrogation must be imminent or presently occurring.'") (citation omitted).

The evidence in this case establishes that Mr. Rose was not being questioned at the time, he was not in custody, and, up to that point, he had only been subjected to an investigative stop, such that he was not "in custody" for purposes of *Miranda*. *See United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008); *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). The evidence does not show that Officer Trice's question to the passenger was likely to prompt *Mr. Rose* to make an incriminating statement when he had not been asked a question. The Court cannot find that Officer Trice "should have known" that his question to another person would have elicited an incriminating response from Mr. Rose. *See Cash*, 733 F.3d at 1279 (citations omitted). Similarly, there is no

evidence that Mr. Rose's incriminating statement about owning the firearm was involuntary such that it would offend the Due Process Clause of the Fourteenth Amendment. *See id.* at 1280.

## IV. Conclusion

For the foregoing reasons, the defendant's Motion to Suppress (Doc. 14) is **denied**. SO ORDERED this 11th day of October, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT